No. 2670

Second Circuit

---

MOSELEY v. RED RIVER OIL MILL, INC.

---

(June 28, 1927. Opinion and Decree.)
(July 25, 1927. Rehearing Refused.)

---

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Obligations—Par. 7, 11.**

In view of Article 1805 of the Civil Code the acceptance, in order to be binding, must be in all things conformable to the offer.

2. **Louisiana Digest — Obligations — Par. 11; Corporations—Par. 46.**

A subscription to capital stock which did not conform to the offer which had an additional guarantee specified is not binding upon the parties and no damages can arise from the non-delivery of the stock on failure to consider the offer accepted.

Appeal from the Ninth Judicial District Court of Louisiana, Parish of Rapides. Hon. Leven L. Hooe, Judge.

Action by Vincent Moseley against Red River Oil Mill, Inc.

There was judgment for defendant and plaintiff appealed.

Judgment affirmed.

Milling, Godchaux, Saal & Milling, of New Orleans, attorneys for plaintiff, appellant.

Thornton, Gist & Richey, of Alexandria, attorneys for defendant, appellee.

WEBB, J. This action in damages arises out of an alleged subscription by plaintiff to the capital stock of the Red River Oil Mill, Inc., defendant, a corporation proposed to be organized under the laws of this state for the purpose of leasing and operating an oil mill situated in Rapides parish and belonging to the Red River Oil Company, Limited, a corporation organized under the laws of this state with its domicil in said parish, in which latter company plaintiff was a stockholder; and plaintiff appeals from a judgment sustaining an exception of no cause of action, and dismissing his suit.

OPINION

Plaintiff in substance alleges that, due to difficulties in financing the further

operations of the mill by the Red River Oil Company, Limited, some of the stockholders determined to organize a new corporation to be known as the Red River Oil Mill, Inc., and that the latter corporation was chartered on August 17, 1924, and that an option was extended to him as one of the stockholders of the Red River Oil Company, Limited, to subscribe to the stock of the Red River Oil Mill, Inc., in a letter of date August 8, 1924, which reads as follows:

"Alexandria, La., August 8, 1924.

"Mr. H. V. Moseley,

"Care Williams & Moseley,

"James Building,

"Chattanooga, Tenn.

"Dear Mr. Moseley:

"Referring to our correspondence beginning with my letter of June 30th, will advise that something was absolutely necessary to be done promptly in order to preserve intact the business of the Red River Oil Company, Ltd. This had to be done before your return, which the writer understood you to say would be on the 1st of September. You were not willing to put up any money, and Mr. Weems explained that he was unable to do so, and the others were not in a financial position to put up money in proportion to their holdings of stock in the Red River Oil Company, Ltd. There was but one plan that could be devised that would enable the company to raise money to guarantee the bank against loss, and that was for the stockholders who were willing to do so to put up a sufficient amount of money to do this. They could, of course, not be expected to put up money for the benefit of those who were unwilling, and hence the only plan we could think of was to form an operating company and lease the mill. There was no way of communicating this information to you because the time was too short. The cotton crop will begin to be picked within two weeks from now and the mill must preserve its customers or else they will go to other mills. An operating company was therefore formed and up to date there are seven subscriptions. Mr. W. C. Scott subscribed and paid for $1000 of stock, and six others, my father, Mr. Bat Weil, Mr. J. L. Bryan, Mr. J. E. Byram, Mrs. F. N. Bryan and myself, subscribed for $5,000 of stock each. All of us signed a guarantee to the Rapides Bank & Trust Company as additional margin for an amount equal to 50% of our stock subscription, that is to say, six of us have signed a guarantee of $2500.00 each and one for $500.00, or rather my father has not yet signed but will sign on his return home, all of the others having signed. You own one hundred and thirty-six shares of stock in the Red River Oil Company, Ltd., and you are invited to subscribe for such an amount of the stock of the operating company as you desire to subscribe for up to 13.6% of the capital stock of the operating company, and on the condition that you sign the guarantee for 50% more than the amount of money that you subscribe and pay for. This option to you is limited to the 15th of September, should you return by the 1st of September, and, if not, to within two weeks after your return. This same option will be given to all of the other stockholders of the company.

"The lease price of the mill is $12,500 per annum, and the lease is from yesterday until the 1st of July, 1925. The payments are made in monthly installments of $1500 per month, beginning on the 1st of September, the last payment of $500 to be made on the 1st of May. This lease price is sufficient to take care of the fixed charges of the mill, which are as follows:

"Fire and tornado insurance ........$ 2,613.11

"Steam boiler insurance ................ 95.34

"Engine insurance ........................ 54.58

"Taxes ........................................ 3,909.82

"Interest .................................... 5,600.00

"Total .......................................$12,272.85

"We ask that you give this consideration and advise your decision promptly on your return from your trip.

"Very truly yours,

(Signed) "J. W. BOLTON,

"President."

That at the time said letter was written and mailed, plaintiff was in Europe and returned early in September, reaching Chattanooga early in the afternoon of the 5th, and went to his office on the 6th of September, where he found the letter awaiting him, which he read, and, on September 8th, he wired defendant's representative for information, the telegram being as follows:

"September 8, 1924.

"Mr. J. W. Bolton,

"President, Rapides Bank & Trust Company,

"Alexandria, La.

"Returned Friday. Reference letter August eighth; please fully inform me in detail regarding business prospects holding company stating capital stock authorized and whether Alexandria competitor will operate this season. I shall gladly pay for copy of lease and holding company charter and by-laws which I should appreciate your forwarding.

(Signed) "VINCENT MOSELEY."

And, on September 9th, he received by wire a reply as follows:

"Vincent Moseley,

"Care Williams & Moseley,

"James Bldg., Chattanooga, Tenn.

"Replying your telegram. Regarding business prospects I hesitate to advise because of the disastrous termination of last season's business after everything looked so well up until Christmas, and one cannot foretell the results of this business because we cannot tell what price we will get for manufactured product. Authorized capital of holding company is fifty

thousand dollars. Lease and charter in usual form. No by-laws adopted.

(Signed) "J. W. BOLTON."

On September 12th he again wired defendant's representative as follows:

"Mr. J. W. Bolton,

"President, Rapides Bank & Trust Company,

"Alexandria, La.

"Please have copy of lease and holding company charter forwarded.

(Signed) "VINCENT MOSELEY."

And, not receiving a reply, he wrote defendant's representative, subscribing for three thousand dollars of the capital stock of defendant company, as shown by letter reading as follows:

"September 17, 1924.

"Mr. J. W. Bolton,

"President, Rapides Bank & Trust Company,

"Alexandria, La.

"Dear Mr. Bolton:

"I beg to request that you enter my subscription to the extent of $3000 for stock in the holding company which negotiated a lease from the Red River Oil Mill Company, Limited. I believe the amount of the subscription entered will fulfill my moral obligation to see the venture through, and I am frank to say that I do not view the speculation as favorable in the least from a business viewpoint, although present conditions have an optimistic tint. I regret that I had some difficulty in securing information sought. I should appreciate your forwarding a copy of the lease and charter, previously referred to, at my expense at your earliest convenience.

"It appears to me that the holding company lease simply offers the opportunity of having the situation involving the Red River Oil Mill Company, Limited, held as it now exists with the constant threat of a foreclosure in the event of a bad season.

I am impressed that we should at once make every intelligent effort to effect the consolidation of competing mills in our territory, particularly covering the areas from which we secure seed. The Memphis mills organized a single corporation in which they all took stock on the basis of the appraisal of the properties entering into the merger. Small independent mills in Texas have recently been accumulated by a few individuals. I believe that you, Mr. Jack Bryan and Mr. Byram can best secure action to that end in view. I only wish that I might be of assistance. If six months of effort to the end mentioned fails to produce results, then I should urge employing our efforts to sell the mill, which, in the event of a prosperous season, might be accomplished. It is, of course, advantageous to sell as a going concern, and that is to me one opportunity the present holding company offers. I have not been informed how we shall be better off a year hence than we are now insofar as our stock ownership in the Red River Oil Mill Company, Limited, is involved. The production of cotton in central Louisiana is distinctly not now a good business risk. Again, the farmer is organizing—to me this means accentuating the present prices due to shortage in the raw product we use by higher prices following organization by the producers of cotton seed. We are still in the midst of 'cut-throat' competition, at present lulled by recent agreements, but nevertheless a continuing potential threat. I should be very glad to learn what you may suggest and why.

"I have just had the pleasure of interviewing a well-known local oil mill operator who informed me that he never purchased seed when the present market for the products did not assure a profit. On the basis of this policy, he took a loss last year of about 10%, whereas if he had continued to operate, he frankly admitted he would have lost his entire properties. May I not be pardoned for again venturing to suggest a similar conservative policy in governing the operations of the holding company formed?

"Yours very truly,
(Signed) "VINCENT MOSELEY."

That the letter was mailed at Chattanooga on the day it was written and received by defendant's representative on September 20th, who, on the latter date, replied, the letter being, in part, as follows:

"Mr. H. V. Moseley,
"Care Williams & Moseley,
"James Building,
"Chattanooga, Tenn.
"Dear Mr. Moseley:
"Your registered letter of September 17th reached me today. Mr. Byram happened to be in the office at the time that it was delivered to me by one of our clerks, and I immediately opened it and showed it to him. My letter of August 8th stated that your option to subscribe for this stock was limited to two weeks after your return, and your telegram of September 8th stated that you had returned on Friday, which was September 5th. Your option, therefore, expired yesterday.

"Your letter is not accompanied with a check, nor do you state in your letter that you are willing to comply with the further conditions of the subscription that all the others have complied with, and that is that you would guarantee the bank for 50% additional in case of loss. I have no desire to be technical, but the question was very thoroughly discussed at the time of the organization of the holding company, and the letter that I wrote you on August 8th outlined thoroughly the conditions upon which your subscription was to be made and the time limit for the same, so I have no authority to accept your subscription. * * *

"Yours very truly,
(Signed) "J. W. BOLTON."

Plaintiff further alleged that the correspondence constituted a binding contract

of subscription and that he was and had been ever since willing, ready and able to perform by paying the amount of his subscription and furnishing the guarantee, and had offered to comply with all of his obligations, and had demanded that the stock be issued to him, but that defendant had failed to comply with his demands.

He also alleged that the defendant ceased operations, and while it had not been formally dissolved it had returned to the subscribers other than plaintiff the amounts paid in by them under their subscriptions and had distributed the earnings of the company to the subscribers other than plaintiff and that the proportionate amount which would' have been due petitioner would have been fifteen hundred and forty and 70-100 dollars.

That the stock of the company was held by the persons mentioned and could not be obtained on the market, and plaintiff fixes the amount of the damages claimed by him at the amount which he alleges should have been distributed to him from the earnings of the company as above set forth.

It is urged in support of the exception that the petition fails to show the acceptance in that plaintiff did not remit the amount of his subscription nor send a guarantee to the bank for fifty per cent of the subscription, nor in any manner bind himself for such guarantee, and, further, that the exception was not made within the time limited.

Considering the question as to the acceptance, the parties agree that the proposal and letter are to be considered as a whole, and plaintiff contends that thus considered it is apparent that the parties did not contemplate that plaintiff should remit with his acceptance the amount of his subscription, or that he would send a guarantee to the bank of fifty per cent of the subscription, in that the proposal shows that some of the subscribers had not paid the amount of their subscriptions nor signed the guarantee to the bank, and, further, that plaintiff, having agreed to subscribe for stock under the proposal, bound himself for the guarantee; while defendant contends that the proposal shows that the immediate object of the parties was to finance the operations of the company, and that cash was required for the subscription and a guarantee to the bank or at least a clear expression of a promise of guarantee.

While it is apparent from the proposal that the organizers of the company contemplated that the amount of the subscription should be paid in cash and that a guarantee would be given to the bank before the stock would be issued, yet, considering the proposal as coming from the defendant, and in view of the fact that some of the subscribers had not paid their subscriptions or signed the guarantee to the bank, and that the plaintiff was to be placed in the same situation as the original incorporators, which is indicated by the proposal, it may be that it was not contemplated that the acceptance of the proposal required the acceptor should remit the amount of his subscription or accompany it with a guarantee to the bank, but it appears to be conceded that the parties did contemplate that on the acceptance of the proposal there would be a binding contract under

which the acceptor would be obligated to pay the amount of his subscription and to be further bound for the obligations of the company to an amount equal to fifty per cent of the subscription.

Considering the proposal, which reads as follows:

· "You own one hundred and thirty-six shares of stock in the Red River Oil Company, Ltd., and you are invited to subscribe for such an amount of the stock of the operating company as you desire to subscribe for up to 13.6% of the capital stock of the operating company, and on the condition that you sign the guarantee for 50% more than the amount that you subscribe and pay for"—

with plaintiff's reply, in which he wrote:

"I beg to request that you enter my subscription to the extent of $3000 for stock in the holding company which negotiated a lease from the Red River Oil Company, Ltd. I believe the amount of the subscription entered will fulfill my moral obligation to see the venture through and I am frank to say that I do not view the speculation as favorable in the least from a business viewpoint although present conditions have an optimistic tint. * * *"

And Article 1805 of the Civil Code which requires the acceptance to be in all things conformable to the offer, and the law under which the subscriber to the capital stock of a corporation is not ordinarily bound for anything further than the payment of his subscription, we do not think it can be said that plaintiff accepted the offer made to him.

However, it is contended that the provision or condition under which plaintiff was invited to subscribe to the capital stock should be considered as equivalent to a stipulation in the charter, and that by authorizing the subscription he also became obligated to sign the guarantee to the bank or to be responsible for an additional amount to that subscribed, but even considered from that point of view, · which is the most favorable light in which it could be presented for the plaintiff, we do not think his acceptance could be given any legal effect.

The purpose of demanding an additional obligation of the subscriber beyond the amount of the subscription is clearly indicated in the proposal as being necessary to finance the operations of the company, and we are of the opinion that the offer called for an unqualified assent on the part of the plaintiff to so bind himself, and we are of the opinion that instead of so doing the plaintiff limited his liability to the amount of the stock subscribed.

We therefore find that plaintiff's petition fails to show an acceptance of the offer made to him, and it is unnecessary to consider whether or not the acceptance was made within the time limited.

The judgment is therefore affirmed.